UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 08-10166-RGS |
| | ) | |
| | ) | |
| MATTHEW DAVIS | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

At first blush, this seems a curious case for federal prosecution.  The defendant is 20 years old.  As an adult, he has been incarcerated for only 6 months.  The offense of conviction involved but four $20 bags of crack cocaine.  Given all this, it is fair to ask why the defendant is here and how the government could advocate for a career offender sentence.

These questions are easily answered.  While the defendant is young, he is a leader of Morse Street, one of city's very active street gangs and an enthusiastic participant in one of its bloodiest gang disputes.  See Detention Testimony of Sgt. John Ford (April 16, 2008)("Det Tr ___") (attached as Exhibit A). While the defendant's adult record is limited, Probation has properly concluded that he is already CHC V (irrespective of his status as a career offender) based on a pattern of increasingly serious juvenile violations and the fact that he violated probation on every adult conviction.  See PSR at ¶¶35-46. Although the offense of conviction is small, removing Matthew Davis from the street has already helped quell crime in an area beset by gang violence that adversely impacts thousands of lives.

See "On Lucerne Street, a Wary Savoring of Newfound Peace"
(Boston Globe February 15, 2009)("To say that living in the
Lucerne Street section of Dorchester was once a battle for
survival is no exaggeration according to the residents of this
neighborhood of multifamily houses, small churches, and
bodegas..... But a walk through the streets there now reveals a
neighborhood reclaimed.  People have begun sitting on their
porches again, mothers let their children play outside longer,
and workers are less wary walking home at night") (attached as
Exhibit B). See also Affidavit of Brian Ball (attached as Exhibit
C) (Federal prosecution of Matthew Davis has had and will
continue to have significant impacts in Boston).

It is equally important to *keep Matthew Davis off the street*
for a reasonable period of time.  In addition to protecting Davis
from himself and protecting the community from his crime, that
will confirm and strengthen a message to his Morse Street
compatriots (and other area gang associates) that further
criminal activity by them will result in a similar fate.  See 18
U.S.C. §3553 (a)(1)(B) (sentencing goals include the need to
afford adequate deterrence to criminal conduct).  See also United
States v. Politano, 522 F.3d 69 (1st Cir. 2008) (recognizing the
importance of general deterrence in post-Booker sentencings);
U.S.S.G. ch. 4, pt. A, introductory cmt. ("General deterrence of
criminal conduct dictates that a clear message be sent to society

2

that repeated criminal behavior will aggravate the need for punishment with each recurrence."[1]  See also Ball Affidavit (attached as Exhibit C)(describing impact of federal prosecution of Matthew Davis).

Notwithstanding all this, the government agrees that a non-guideline case is appropriate given the defendant's background and the street-level character of his drug trafficking.  The government is therefore seeking a sentence of 96 months (a 33% reduction from the low end of the guideline) in the hope it will be sufficient but not greater than is necessary to get Mr. Davis to change his ways and to protect the people of Mattapan from him and further gang violence.

To maximize the chance that the defendant will not re-offend, the government is also seeking certain special conditions of supervised release.  They include the requirement that the defendant stay out of the Morse Street Area and stay away from his Morse Street compatriots.  The government believes that while the defendant is in jail and on supervised release, BOP and Probation should address obvious anger management issues,

---

[1] Accord, Jeremy Bentham, The Rational of Punishment 20 (Adamant Media 2003) ("General prevention ought to be the chief end of punishment, as it is its real justification. If we could consider an offence which has been committed as an isolated fact, the like of which would never recur, punishment would be useless. It would be only adding one evil to another"). available at http://www.laits.utexas.edu/poltheory/bentham/rp/.

continue mental health treatment, and provide the defendant with needed vocational and educational skills (including diagnostic work to identify and address any learning disability issues). The government will continue to confer with defense counsel and Probation in the hopes of identifying additional conditions that will help ensure that this offense will be Davis' last.

1. **Matthew Davis' Gang Activities**

In most career offender cases, it is customary for the government to review the defendant's criminal record first because its is the principal driver of the appropriate sentence.

But this is not such a case.  Here, it's the defendant's activities with Morse Street and his leadership position in the gang that show the requested sentence is needed to achieve the purposes of section 3553.  See Huebner, et al., "Gangs, Guns, and Drugs: Recidivism Among Serious, Young Offenders" Criminology & Public Policy Volume 6 Issue 2 (2007)("Gang membership, even within a high-risk sample, emerged as a significant predictor of recidivism as more traditional risks for offending, such as gun use, demographics, prior convictions, and community disadvantage, did not"); Braga et al, "Losing Faith? Police, Black Churches, and the Resurgence of Youth Violence in Boston" 6 Ohio State Journal of Criminal Law Volume 1 at 141-172 (Fall 2008)(noting that "much of the increase in youth homicide [in Boston] has been driven by a resurgence of gang violence" and that gang violence

4

accounts for a "disproportionate share" of homicide and gun
violence in Boston)(attached as Exhibit D) (hereinafter, "Losing
Faith"); Olson, "The Relationship Between Gang Membership and
Inmate Recidivism," Illinois Criminal Justice Information
Authority Research Bulletin (May 2004) (concluding that gang
members had significantly higher recidivism rates than non-gang
members).

Matthew Davis' gang involvement is an established fact.   On
the day of his arrest, for example, Davis acknowledged to the
arresting officers that he was a member of Morse Street.    Det.
Tr. at 24-25.  Davis was also wearing a customized hat attesting
to both his Morse Street membership and its alliance with the
Norfolk Street gang.  Id. (At arrest, Davis was wearing Milwaukee
Brewers hat displaying embroidered term "North County."  Brewers
clothing is the "colors" for Morse Street members and "North
County" is a reference to the gang collaboration between Morse
and Norfolk Street).  See also PSR, Government Objections
(explaining that Morse is referred on the street as "Morse
County" and that Norfolk Street members are known as the kids
from "up north").  Davis also has two tattoos that are testaments
to fellow Morse Street members killed as a result of suspected
gang violence.  PSR at ¶81 (Davis has "RIP Short" and "RIP
Harlan" tattoos on hands and stated that these are in memory of
close friends killed in shootings).  Compare Det Tr at 27

(explaining that "Short" is a reference to Dwayne Turba, a Morse Street associate killed in 2006 and "Harlan" refers to Haraln Harris, killed in 2004 while in territory claimed by the Lucerne Street Doggz, Morse Street's principal gang rival).

Moreover, Davis is not just a member of Morse Street; he is one of its leaders.  Sgt. Ford made this clear in his detention testimony based on both observations he has made on the street (i.e, the extent to which other Morse Street members deferred to Davis) and by the fact that Lucerne Street Members demanded that Davis attend 2006 truce discussions as a representative of Morse Street.  Det Tr at 28-29.  Davis also identified himself as a "5-star general" on April 2, 2008 (days before his federal arrest) to members of the BPD Gang unit who were accompanied by a Boston Herald Reporter on that evening.  See Affidavit of Mark Bordley attached as Exhibit E and accompanying Boston Herald article of April 7, 2008.  Davis' leadership position in Morse Street only accentuates the reasonableness of the sentence being requested in this case.  See United States v. Johnson 184 Fed. Appx 746 (10th Cir. 2006)(at sentencing, gang membership was "significant" and appropriate for inclusion in the PSR because....  "gang members are more likely to engage in criminal activity and perhaps related violence than ordinary citizens"); United States v. Aquirre-Roche, 2008 WL 5401440 (11th Cir. 2008)(district court properly considered defendant's gang membership at sentencing);

United States v. Hernandez-Villanueva, 473 F.3d 118 (4th Cir.
2007)(imposing above-guideline sentence based on defendant's gang
activities).

The record also establishes that Morse Street has been
engaged in a rivalry with Lucerne Street for many years and that
this has been one of the city's most serious gang conflicts. In
his detention testimony, Sgt Ford identified the dispute between
Morse (and its ally Norfolk Street) and the Lucerne Street Doggz
as the most serious gang conflict in his district.  Det Tr at 23.
That corroborated the detention affidavit in In re Lucerne Street
Doggz (attached as Exhibit F) in which Sgt. Ford stated that
Lucerne Street was the most violent gang in the city and
identified Morse Street as one of its principal rivals.[2] Id. at
¶¶5-12.  See also Losing Faith (Exhibit D) at 7 (discussion of
Lucerne Street).  This is another appropriate sentencing
consideration. See, e.g., United States v. Politano, 522 F.3d at

_____

[2] The Lucerne Street Doggz detention affidavit attached as
Exhibit F also corroborated Matthew Davis' involvement in this
conflict and his leadership position with Morse Street. On March
9, 2006, Sgt Ford and other officers from District B-3 responded
to a complaint about drug trafficking at the Kentucky Fried
Chicken at 1160 Blue Hill Avenue in Mattapan.  Exhibit E at ¶¶11-
13.  Inside, the police found 7 Lucerne Street Associates,
substantial amounts of gang graffiti, and recovered a gang roster
from inside the restaurant's rest room.  See also Id. at Exhibit
2 (copy of gang roster).

The roster is important here because it also referenced
Lucerne's conflicts with other gangs (including Morse Street) and
identified individual Lucerne rivals.  That list included Matthew
Davis.  Id.

7

72 (court may consider particular community impacts under section
3553).

## 2.  **Criminal History**

Another important issue for this sentencing is the
defendant's criminal history.  Probation has correctly determined
that the defendant has two prior convictions for crimes of
violence.  PSR at ¶47.  He therefore qualifies as a Career
Offender under the federal sentencing guidelines and is an
individual who Congress has directed should be sentenced "at or
near the statutory maximum."  28 U.S.C. 994(h). See Mistretta v.
United States, 488 U.S. 361, 376 (1989) (noting that Congress
provided detailed guidance to the Sentencing Commission regarding
the sentencing of career offenders); United States v. Stevens,
2007 WL 2981172 (7th Cir. 2007) (in affirming sentence imposed
upon career offender, Court noted that "United States v. Booker,
543 U.S. 220 (2005), does not disturb § 994(h) or [U.S.S.G.] §
4B1.1.").[3]

---

[3] Section 994(h) is not a mandatory directive that deprives
the Court of authority to impose a sentence below the low end of
the advisory guideline range. It is, however, an express
Congressional policy judgment that must be taken into account
with several of the sentencing factors set out in 18 U.S.C.
§3553(a). E.g., United States v. Lovely, 2009 WL 782811 (1st Cir.
2009) (recognizing that, despite "considerably leeway" now
granted sentencing courts, section 3553(a)(5) requires
consideration of policy statements issued by the Sentencing
Commission and that those policy statements "follow the mandate
to the Commission in 28 U.S.C. § 994(h) to 'assure that the
guidelines specify a sentence to a term of imprisonment at or
near the maximum term' for career offenders as defined in the

Undoubtedly, the defendant will argue that application of the career offender guideline is inappropriate here because his age and the nature of the underlying predicates.  He will therefore urge the court to depart or deviate from the low end of the advisory guideline range.  But compare U.S.S.G. § 4A1.1 (Introductory Commentary)(recognizing that upward departures may be particularly appropriate "in the case of younger defendants ... who are more likely to have received repeated lenient treatment, yet who may actually pose a greater risk of serious recidivism than older defendants"); U.S.S.G. §4A1.3(b)(3)(A) (limiting the extent of criminal history departures granted to career offenders under the guidelines to one criminal history category).[4]

This argument has some merit.  The predicates listed in the PSR are not as serious as other crimes that qualify under U.S.S.G. §4B1.1.  PSR at ¶¶41-42.  Nor has the defendant been sufficiently involved with the adult criminal justice system to

---

statute"); United States v. Giggey, 551 F.3d 27, 29 (1st Cir. 2008) (en banc) (guidelines remain the starting point for any sentencing decision, and "*the Guidelines range may substantially influence a particular defendant's sentence, especially when large increases imposed on career offenders are involved*")(emphasis supplied).

[4] This provision obviously does not restrict the Court's ability to further deviate under Booker.  It is, however, a clear indication of the seriousness with which both Congress and the Sentencing Commission view the sentencing of repeat offenders and is therefore another factor supporting the government's recommended sentence.

warrant a sentence of 12½ years.  Indeed, it is precisely because of these factors that the government is recommending a sentence well under the low end of the advisory guideline range.

At the same time, the argument only goes so far.  The defendant's record must be viewed as a whole.  While the defendant's adult record is relatively brief, they are unfortunately part of a continuing pattern of offenses going back to the age of 15.

The starting place is of course the Presentence Report.  See PSR at ¶¶35-46. Despite his youth, the defendant has already amassed 10 criminal history points and is in CHC V without regard to any career offender enhancement.  PSR at ¶47.  This is because he has been under almost continual criminal justice system supervision since the age of 15. Id.   During that time, he incurred six determinations of delinquency in addition to the two adult convictions scoreable for career offender purposes. Id. These offenses include of six crimes of violence and drug offense in addition to property and other crimes.  See PSR at 36 (resisting arrest); 38 (resisting arrest); 39 (assault and battery); 40 (possession Class D); 41 (assault and battery); and 42 (resisting arrest).  Under both pre- and post-Booker law, Davis' persistent commission of crime warrants a significant sentence.  E.g, United States v. Smith, 505 F.3d 463, 471 (6th Cir. 2007) (imposing above guidelines sentence where it was

10

obvious that prior incarcerations were "obviously not sufficient to comply with the purposes of § 3553(a)(2)").

The defendant's response to the criminal justice system is of even greater concern.  See United States v. Hernandez, 896 F.2d 642, 645 (1st Cir. 1990)("a defendant undermines the integrity of the criminal justice system when he commits a crime while ... under its supervision and control").  As a juvenile, the defendant violated his probation, parole,  or was otherwise returned to DYS custody on at least four separate occasions.  PSR at ¶35.  The longest period was on the street while under DYS supervision was approximately 4 months.  Id.  He nevertheless has managed to commit crimes as a juvenile while under some form of release no less than 5 separate times.  PSR at ¶¶36-40.

The defendant was released from DYS custody on his 18th birthday. PSR at ¶41.  He committed his first adult offense less than 60 days later. Id. at 39. He has remained on some form of adult supervision between that time and commission of the offense of conviction during which period he committed two crimes of violence and violated probation on both those cases. Even though Davis was sentenced to prison for these violations, his criminal activities persisted after release and he was already on pretrial release on two other cases when arrested for possession of the crack cocaine at issue here.  See PSR at 49, 58, and 59.

Moreover, as significant as this history is, it is other

interactions between Davis and the criminal justice system that confirms the danger that Davis presents and the reasonableness of the proposed sentence.  Attached as Exhibit G is a compilation of Boston Police Reports involving the defendant.  It prompted Magistrate Judge Bowler to characterize Mr. Davis' history "as the longest juvenile record I've ever see, one after another, serious offenses, civil restraining order." Det Tr at 54.

While Judge Bowler's reaction to Exhibit G is illuminating, it's the incidents that Exhibit G describes that are most compelling.  Here's a summary of those reports:

| DOC. | DATE | STATUS | COMMENT |
|---|---|---|---|
| 1 | 5/22/01 | N/A | ASSAULT AND BATTERY TEACHER–NOT CHARGED |
| 3 | 5/22/01 | N/A | DEFENDANT PICKED UP ON CHINS WARRANT |
| 4 | 1/25/02 | N/A | DEFENDANT FOUND IN STOLEN CAR CASE DISMISSED |
| 6 | 3/22/02 | **PT RELEASE** | DEFENDANT THREATENED WITH STABBING |
| 8 | 8/30/02 | **PT RELEASE** | DEFENDANT TAKES CAR W/O AUTHORITY MOTHER REPORTS TO POLICE  CASE DISMISSED 9/16/02 |
| 10 | 10/4/02 | N/A | DEFENDANT THREATENED WITH STABBING.  MOTHER CALLS POLICE DOES NOT PROVIDE LAST NAMES OF ALLEGED OFFENDERS |
| 16 | 5/22/03 | N/A | CALL FOR HIT AND RUN ACCIDENT INVOLVING 1997 HONDA STOLEN |

| | | | |
|---|---|---|---|
| | | | PREVIOUS DAY.  DEFENDANT IDENTIFIED AS DRIVING CAR EARLIER THAT DAY.  NEIGHBORS REPORT THAT DEFENDANT AND RASHAD VENTER *(AN IDENTIFIED MORSE STREET MEMBER ON THE PROPOSED ASSOCATIONAL RESTRICTION)* ARE "ALWAYS SPEEDING AROUND NORMANDY STREET IN STOLEN CARS." |
| 19 | 6/4/03 | **PT RELEASE** | DEFENDANT RIDING MOPED HE CLAIMED WAS PURCHASED FROM UNKNOWN INDIVIDUAL BY MOTHER; ALMOST HITS POLICE CAR.   AFTER BEING NOTIFIED, MOTHER ASKS "WHERE DEFENDANT GOT MOPED." CASE DISMISSED 11/5/03 |
| 21 | 10/9/03 | **PT RELEASE** | DEFENDANT THREATENED WITH BODILY HARM BY CELESTE LNU. |
| 12 | 10/10/03 | **PT RELEASE** | POLICE CALLED TO MADISON PARK HIGH SCHOOL DEFENDANT HAS SUSPENSION HEARING FOR HARASSING FEMALE STUDENT. MOTHER THREATENS VICTIM AND IS ORDERED OFF SCHOOL PROPERTY |
| 14 | 10/28/03 | **PT RELEASE** | DEFENDANT STOPPED WHILE RIDING STOLEN MOTORCYCLE DEFENDANT FALSELY CLAIMED THAT MOTORCYCLE BELONGED TO COUSIN.   **FOUND DELINQUENT**, **COMMITTED DYS AFTER PROBATION VIOLATION** |
| 27 | 11/7/03 | **PT RELEASE** | DEFENDANT DRIVING STOLEN TOYOTA AT HIGH RATE OF SPEED REFUSED TO PULL OVER FOR POLICE, ACCELERATING INSTEAD. RESISTED OFFICERS WHO ATTEMPTED TO ARREST HIM.  **FOUND DELINQUENT**. **COMMITTED TO DYS AFTER** |

PROBATION VIOLATION

| | | | |
|---|---|---|---|
| 29 | 1/13/04 | **PT RELEASE** | DEFENDANT ARRESTED FOR TRESPASSING.  OTHER MEMBERS OF GROUP HAD MARIJUANA AND KNIFE. **FOUND DELINQUENT COMMITTED TO DYS AFTER PROBATION VIOLATION** |
| 15 | 4/23/04 | **PT RELEASE** | **DEFENDANT ARRESTED ON DEFAULT WARRANT** |
| 31 | 5/29/04 | **PT RELEASE** | DEFENDANT ON STOLEN MOTORCYCLE.  REFUSES TO PULL OVER, DRIVES MOTORCYCLE INTO POLICE CRUISER, THEN RUNS. RESISTS ARREST. **FOUND DELINQUENT COMMITTED TO DYS AFTER PROBATION VIOLATION** |
| 32 | 9/23/04 | **DYS PROBATION** | SCHOOL ASSAULT.  DEFENDANT FLEES, LATER THREATENS VICTIM **FOUND DELINQUENT** |
| 35 | 12/13/04 | **DYS PROBATION** | SCHOOL ASSAULT DEFENDANT BLEEDING ALLEGED TO HAVE STRUCK OTHER SUSPECT--NOT CHARGED |
| 37 | 3/3/05 | **DYS PROBATION** | SCHOOL ASSAULT GROUP ENTERS MADISON PARK HIGH SCHOOL NOT CHARGED.  OTHER MEMBER OF GROUP HAD KNIFE |
| 39 | 3/7/05 | **DYS PROBATION** | DEFENDANT ARRESTED FOR POSSESSION OF MARIJUANA.  **HAD KNIFE IN HIS POSSESSION AND WAS WEARING ELECTRONIC MONITORING BRACELET WHILE DEALING WITH MARIJUANA. DEFENDANT ADMITS TO SUFFICIENT FACTS CWOF AND THEREAFTER DISMISSED** |

14

| 41 | 10/3/03 | **DYS PROBATION** | **ARRESTED ON DYS PROBATION WARRANT** |
| 42 | 12/4/05 | **DYS PROBATION** | **ARRESTED ON DYS PROBATION WARRANT** |
| 43 | 4/21/06 | **DYS PROBATION** | **ARRESTED ON DYS PAROLE WARRANT** |
| 44 | 7/9/06 | **DYS PROBATION** | DOMESTIC VIOLENCE COMPLAINT FILED BY ARIANNA CLOSE |
| 46 | 8/21/06 | N/A (ADULT) | DEFENDANT ALLEGED TO HAVE THREATENED MEMBER OF LUCERNE STREET AT ELLA J. BAKER HOUSE. DEFENDANT IDENTIFIES HIMSELF AS FROM MORSE STREET.  DEFENDANT HAS "RIP SHORT" TATTOO.  OTHERS IN POSSESSION OF KNIVES. |
| 49 | 8/24/06 | N/A | DOMESTIC VIOLENCE COMPLAINT FILED BY ARIANNA CLOSE DEFENDANT ALLEGED TO HAVE GRABBED VICTIM'S HAIR, THROWN HER TO GROUND, AND TAKEN WALLET AND PHONE |
| 51 | 8/26/06 | N/A | DOMESTIC VIOLENCE COMPLAINT FILED BY MOTHER OF ARIANNA CLOSE |
| 53 | 9/16/06 | REST. ORDER | DOMESTIC VIOLENCE REPORT FILED BY MOTHER OF ARIANNA CLOSE ALLEGING VIOLATION OF RESTRAINING ORDER NO TRESPASS ORDER ALSO ISSUED |
| 55 | 9/27/06 | **PT RELEASE** | ASSAULT IN SCHOOL **CWOF; ULTIMATELY INCARCERATED AFTER THIRD PROBATION VIOLATION** |
| 57 | 10/19/06 | **ADULT PROB** | *INCIDENT OCCURS SAME DAY DEFENDANT IS IN COURT ON A&B* |

| | | | |
|---|---|---|---|
| | | | *CASE AND PLACED ON PROBATION..* DEFENDANT DRIVING STOLEN CAR. TURNS HEADLIGHTS OFF AFTER SEEING POLICE ATTEMPTS TO FLEE; SLAMS VEHICLE INTO PARKED CAR AND RUNS. **CONVICTED ULTIMATELY INCARCERATED AFTER PROBATION VIOLATION** |
| 60 | 2/8/07 | **ADULT PROB** | MEMBER OF LUCERNE STREET GANG REPORTS DEATH THREATS BY DEFENDANT, IDENTIFIED AS MORSE STREET MEMBER |
| 61 | 2/15/07 | **ADULT PROB** | DEFENDANT ARRESTED ON STRAIGHT WARRANT FOR THREATS CASE SUBSEQUENTLY DISMISSED |
| 61 | 3/19/07 | **ADULT PROB** | **WARRANT ISSUED ON DEFENDANT** |
| 62 | *9/4/07* | **PT RELEASE** | *DEFENDANT AND SECOND VICTIM FROM MORSE STREET SHOT AT 500 BLUE HILL AVENUE (.5 MILES FROM MORSE STREET) SUBSTANTIAL BALLISTICS EVIDENCE FOUND ON SCENE* |
| 64 | 11/14/07 | **PT RELEASE** | DEFENDANT ARRESTED FOR TRESPASSING AT BURGER KING ON WASHINGTON STREET, IDENTIFIED AS SITE "FOR RISING GANG ACTIVITY MEETINGS AND VIOLENT CRIMES." DEFENDANT PART OF GROUP THAT REFUSES TO LEAVE, BLOCKS ENTRANCE, TAUNTS OFFICERS. AFTER ARREST, *DEFENDANT TELLS OFFICERS THAT THEY WERE JUST "GETTING SOME HEAT"* **CASE PENDING AS OF TIME OF PRESENT ARREST** |
| 65 | 11/24/07 | **PT RELEASE** | OFFICERS RECEIVE REPORT OF MALE CHASING FEMALE TO BEAT HER. POLICE FIND ARIANNA CLOSE WHO |

| | | | REPORTS THAT DEFENDANT SMASHED HER CELL DURING ARGUMENT PHONE BUT DID NOT BEAT HER  **CASE PENDING AS OF TIME OF PRESENT ARREST** |
|---|---|---|---|
| 67 | 12/1/07 | **PT RELEASE** | POLICE RESPOND TO DOMESTIC VIOLENCE REPORT AT HOME OF ARIANNA CLOSE VICTIM'S FATHER CLAIMED THAT DEFENDANT HAD GUN.  NO GUN RECOVERED |
| 69 | 1/14/08 | **PT RELEASE** | POLICE INVESTIGATE MOTOR VEHICLE OWNED BY DEFENDANT REGISTRATION IS TO 26 GREENBROOK ROAD, HYDE PARK |
| 70 | 1/18/08 | **PT RELEASE** | POLICE RESPOND TO DOMESTIC VIOLENCE CALL AT 1 FRUEAN PLACE DORCHESTER.  DISPUTE BETWEEN DEFENDANT AND EX-GIRLFRIEND, ARIANNA CLOSE.  DEFENDANT'S MOTHER ASKS POLICE TO REMOVE DEFENDANT FROM APARTMENT FOR THE NIGHT.  NO PHYSICAL CONTACT ALLEGED |
| 74 | 2/19/08 | **PT RELEASE** | POLICE CALLED TO INVESTIGATE POSSIBLE DISTURBANCE AT DORCHESTER DISTRICT COURT BETWEEN TWO GROUPS. DEFENDANT WITH GROUP OF MORSE STREET MEMBERS; OTHER GROUP FROM LUCERNE |
| **75** | **2/24/08** | **PT RELEASE** | **DEFENDANT ARRESTED IN PRESENT CASE** |
| 77 | 2/27/08 | **PT RELEASE** | POLICE RESPOND TO DOMESTIC VIOLENCE REPORT INVOLVING DEFENDANT AND ARIANNA CLOSE |
| 79 | 3/8/08 | **PT RELEASE** | POLICE RESPOND TO DOMESTIC VIOLENCE  AT DEFENDANT'S HOME |

Exhibit G at pp. 1-80.

This information underscores several important aspects of the defendant's record already discussed.  The first is his utter disdain for the criminal justice system.  Exhibit G reflects 18 incidents that occurred while Davis was on pretrial release and 12 more that took place while Davis was on adult or DYS probation.  It shows that Davis has gone out and committed crime *on the same day* he appeared in Court and was involved with drugs while wearing a court imposed electronic monitoring bracelet. Exhibit G at pp 39 and 57.  It also reflects that Davis has been arrested on outstanding default or probation/parole warrants at least 5 times.   Ex. G at pp 15 (default); 41 (probation); 42 (probation); 43 (parole); 75 (present case; default warrant issued from Brighton District Court).

It is also distressing to note that Mr. Davis does not appear to have changed his behavior despite being incarcerated form an extended period in this case.  Attached as Exhibit H are 7 disciplinary reports that Davis has incurred while in pretrial custody including reports for fighting and repeatedly disobeying prison regulations and prison staff.

Exhibit G contains more ominous information as well. The defendant has already been shot once in the Morse Street area. Ex G at 62.  He has regularly attempted to flee from police and

repeatedly resisted arrest. Id. at 27, 31, 57, 64.[5] He also has
a substantial history of domestic violence that shows the mother
of his ex-girlfriend had good reason to obtain the 209A order
described at paragraph 79 of the PSR. See Ex. G at pp. 44
(domestic violence complaint filed against defendant); 49 (second
complaint filed by same victim; defendant alleged to have grabbed
victim, thrown her to ground and taken wallet and phone); 51
(complaint filed by victim 1's mother two days later); 67
(defendant respond to domestic violence call in which victim's
father claimed defendant had gun); 71 (domestic violence call at
defendant's residence; mother asks po0lice to remove defendant
from home); 77 (domestic violence incident); 79 (police respond
to domestic violence report at defendant's home). All of this
suggests that the defendant has significant anger management
problems which make his gang involvement all the more
disconcerting, particularly because he frequently carries (or is
in the company of others who carry) weapons. See Ex G at 29
(others armed); 37 (others armed) 39 (defendant in possession of
knife); 46 (others in possession of knives during incident in
which defendant is alleged to have threatened Lucerne Street
member with a knife inside Ella J. Baker House).

   Reports included in Exhibit G also confirm Davis' gang

_____

   [5] As set forth above, this conduct has persisted while the
defendant is in jail on the present charges. See Exhibit H
(Wyatt disciplinary reports for 2008-09).

affiliation/activities in what is troubling detail.  As set forth above, the defendant was shot in 2007 along with another Morse Street associate less than a half-mile from Morse Street itself. Ex G at 62.  Other reports indicate that he has repeatedly been involved in incidents with Lucerne Street and has threatened Lucerne Street members more than once.  See G at 46 (defendant threatens Ronny Fullard with knife); 60 (Lucerne Street members report receiving death threats from defendant); 74 (police respond to disturbance at Dorchester District Court between Lucerne and Morse Street). All of these factors also fully support the 96-month sentence the government seeks.

### 3.  **Mitigating factors**

The sentencing in this case must also consider any mitigating factors that support the substantial deviation that the government is recommending.  While it is unclear exactly what additional issues the defense will raise, there are certain factors the government would like to address.

### A.  **Age**

The defendant's youth is a factor that some people believe counsels for a lower sentence in any post-Booker prosecution. The government disagrees here, both because Davis' youth actually makes it more likely that he will recidivate, see "Massachusetts Recidivism Study: A Closer Look at Releases and Returns to Prison" (Urban Institute 2008) (recognizing high recidivism rates

for young, single African American males in Massachusetts study
of inmates released in 2002)(available at
www.urban.org/publications/411657.html),[6] and because it is
individuals in his age group who lie at the heart of Boston's
violence problem. Losing Faith (Exhibit D) at 6.  See also United
States v. Plaza, 471 F.3d 876, 879 (8th Cir. 2006)("An
extraordinary reduction of a sentence cannot be based largely on
the youth of the defendant because '[r]elative youth is a factor
that may apply to many [defendants], and it is unlikely that
district courts uniformly will adopt the view of the district
court in this case.'"); U.S.S.G. §5H1.1. ("[a]ge (including
youth) is not ordinarily relevant in determining whether a
departure is warranted").

   **B.  Drug Use**

   Serious addiction or other drug-related problems may also
properly affect post-Booker sentencings.  Here, there is no
history of significant drug use, see PSR at ¶89 (defendant
reports smoking marijuana cigarette laced with crack "once in [a]
blue moon"), thereby indicating that the defendant was selling
drugs for profit.  This has prompted other courts to impose

---

   [6] This study is significant because it identifies
incarceration under a drug mandatory minimum as a factor that
significantly *reduces* recidivism rates. Id. at 15.  This in turn
suggests that a sentence that is sufficiently long to break the
bonds with fellow gang members may well facilitate
rehabilitation.

higher sentences.  <u>Compare</u> <u>United States v. Hairston</u>, 502 F.3d
378 (6th Cir. 2007) (affirming 51% reduction from guideline range
where defendant sold crack cocaine to support his own dependence)
<u>with</u> <u>United States v. Blaso</u>, 2008 WL 227863 (3rd Cir.
2008)(affirming sentence imposed that recognized the
"catastrophic consequences of crack dealing") <u>and</u> <u>United States</u>
<u>v. Taylor</u>, 2007 WL 1224045 (7th Cir. 2007) (affirming crack
cocaine sentence based on, among other things, sentencing judge's
recognition that "that crack dealing is a serious crime because
crack is highly destructive to its consumers")[7].

### C.  <u>Crack-Powder disparity</u>

This is also not a sentencing driven by the type of drug at
issue.  Because the defendant is a career offender, his guideline
range is unaffected by the fact that he choose to sell crack
cocaine.[8]

It is appropriate to recognize that the defendant was

---

[7]  The defendant's ability to fund regular marijuana use
despite the absence of any lawful employment (<u>see</u> PSR at ¶¶89,
94), also suggests other illegal activity.  <u>See also</u> <u>United</u>
<u>States v. Newton</u>, 891 F.2d 944, 948 (1st Cir. 1989) (possession
of unexplained asset relevant to drug trafficking crime); <u>United</u>
<u>States v. Ariza-Ibarra</u>, 605 F.2d 1216, 1224-25 (1st Cir. 1979)
(evidence of the acquisition of otherwise unexplained wealth may
corroborate other evidence of criminal activity).

[8] The Department of Justice has recently announced it will
work with Congress and the Sentencing Commission to eliminate the
disparate treatment between crack cocaine and cocaine
hydrochloride.  <u>See</u> Testimony of AAG Lanny Breuer before the
Senate Judiciary Committee (April 29, 2009).  Those revisions
would have no effect here.

involved in the distribution of street-level amounts of drugs. Compare <u>United States v. Williams</u>, 435 F.3d 1350 (11th Cir. 2006) (affirming variance given to career offender who dealt small amount of drugs) <u>with</u> <u>United States v. Pearce</u>, 191 F.3d 488, 498 (4th Cir.1999) ("[W]e cannot conceive of any drug felony that would be considered minor" for purposes of departing from a career offender guideline range.)  This is another factor that the government considered in recommending a sentence 33% under the low end.

**4.   <u>Rigid conditions of supervised release should be imposed in this case</u>**

The government also requests that this Court take an active role in the defendant's supervised release.  The government urges the Court to impose Supervised Release for at least 5 years. Although 5 years is above the minimum period required by 21 U.S.C. §841(b)(1)(C), the government believes it to be appropriate here in view of the deviation to which it has agreed and the history and characteristics of the defendant.

**A.   <u>The defendant should be ordered to stay away from Morse Street while on supervised release</u>**

An important component of the overall sentence the government is recommending is that the defendant be given 5 years of supervised release and be ordered to stay away from the Morse Street Area and other Morse Street members during this period. The purpose of this restrictions is to keep the defendant in a

23

new environment where there will be fewer opportunities to commit crime and where the defendant will be able to focus on other rehabilitative efforts that the government is recommending he be required to make. See Cullen, "Environmental Corrections - A New Paradigm for Effective Probation and Parole Supervision," 66 Federal Probation 2, 28-37 (Sept. 2002) ("[t]he effectiveness of probation and parole supervision will be increased to the extent that officers systematically. . .reduce the extent to which offenders are tempted by and come into contact with opportunities for crime").[9]  These restrictions simply make sense in this case where much of the troubles that the defendant has experienced are specifically related to the area--Morse Street--in which he has spent his time and where his Morse Street compatriots and their rivals are likely to be found.[10]

---

[9] The Court's power to impose such a condition is clear. Under 18 U.S.C. §3583(d), the court is directed to impose certain mandatory conditions of release and may authorize "any other condition it considers appropriate."  Those provisions specifically allow a sentencing court to require a defendant to "refrain from frequenting specified kinds of places or from associating unnecessarily with specified persons," to "reside in a specified place or area, or refrain from residing in a specified place or area," or "remain in the jurisdiction of the court, unless granted permission to leave by the court or a probation officer."  The only constraint on this authority is that the conditions be reasonably related to the criteria set out in § 3553--nature/circumstances of the offense, history/characteristics of the defendant, the seriousness of the offense, need for future deterrence/public protection, and need to rehabilitate the defendant.

[10] At least three federal courts of appeal have upheld geographic restrictions as a condition of probation or supervised

The government also suggests that this condition be imposed without prejudice to his right to seek modification of it based on changed circumstances and his own conduct and that the Probation Officer be permitted to waive the geographic restriction during daylight hours on holidays such as Christmas, Thanksgiving, Easter, and birthdays as he or she believes is appropriate after the first year of supervised release. See United States v. Garrastequy, 559 F.3d 34 (1st Cir. 2009) (affirming 12 year restriction from Suffolk County on plain error review).

### B. Associational restrictions

The government is also asking this Court to impose

---

release when the restriction served as a deterrent to protect the victimized community and/or rehabilitate the defendant. See United States v. Cothran, 855 F.2d 749 (11th Cir. 1988) (validating a probation restriction that prevented defendant, convicted of cocaine distribution to minors, from traveling to Fulton County, Georgia because his return to a high-crime neighborhood in southeast Atlanta would likely result in his continued criminal activity and the endangerment of neighborhood youth); United States v. Sicher, 239 F.3d 289, 292 (3d Cir. 2000) (upholding a supervised release restriction, after various drug convictions, that covered two counties in the Allentown, Pennsylvania area because the "territorial limitation [was] clearly intended to promote [defendant's] rehabilitation by keeping [defendant] away from the influences that would most likely cause her to engage in further criminal activity"). See also United States v. Alexander, 509 F.3d 253, 256-57 (6th Cir. 2007) (affirming condition of supervised release that required defendant to live in city several hundred miles away from family for first 12 months of supervised release; court noted that condition: (a) "will further [defendant's] rehabilitation efforts by temporarily removing him from the destructive influences that have plagued him;" and (b) "holds the potential to protect the community from future crimes as well").

associational restrictions precluding the defendant from contacting or being in the company with identified associates of the Morse Street Gang.  As has already been noted, the defendant's involvement in the criminal justice system has invariably involved incidents at or near Morse Street, often in company of other Morse Street associates identified by the Boston Police Department.  See, e.g., Exhibit G at 4 and 8 (Defendant arrested along with Rashad Venter); 17 (same); 29 (Henry Coakley, Anthony young); 33 (William Boyd); 35 (Andre Barnett, William Boyd); 37 (Rashad Venter, Kareem Parker, Brandon Johnson, William Boyd, Andre Barnett); 47 (Dimitri Harris); 57 (Jamal Brodie, Andrick Wilkins); 60 (Jamal Brodie).  The need for such a restriction is particularly important here given the defendant's gang activities. See discussion, above.

Attached as Exhibit H is a preliminary list of proposed terms and subjects of an associational restriction.  The government is waiting for additional input from the Boston Police Department and may provide the Court and the defendant with a updated list at sentencing.

### C. Halfway house/other programs

The government believes that the defendant should spend at least his first 6 months while on supervised release in a halfway house, with the location of that house to be determined at the time of his release.  Compliance with program requirements at

such a facility should be a requirement of his supervised release conditions.

While it is easy to say that the halfway house should be located outside Boston,[11] that will only make sense if the defendant is located in a place where he will also have access to programming to assist his educational and employment efforts and that will allow him to comply with his associational restrictions.  The government has already identified three possible programs of a type that might be of assistance to the defendant: Roca Inc. in Chelsea; Y.O. Unlimited in Roxbury; and Youthbuild in Roxbury.  Each of these programs offers a combination of work, school, and life skill training that the defendant appears to need.  Youthbuild has a construction training program that might be appropriate here given the defendant's expressed interest in this field.  PSR at ¶93.

The defendant should be required to attend such a program and compliance with its rules and regulations should be a condition of his supervised release.  Without the kind of assistance that these programs can offer, the defendant's ability to comply with other conditions essential to building a future may be adversely affected.

Probation may be aware of other programs that might be

---

[11] Other than Coolidge House, the government is aware of facilities in Lawrence and Barnstable that might also be suitable for the defendant.

better suited to the defendant's particular needs upon his release.  The location of this kind of programming should dictate where he lives.

### D. GED and vocational training

The government also recommends that the defendant be required to complete his GED (if he hasn't done so by the time of his release from prison) and be required to undergo such further education and/or vocational training (either in construction, automotive or other areas as may be appropriate) as Probation determines is available and appropriate.

### E.  Specialized treatment

It's not clear that drug treatment is presently required. See PSR at ¶*&.  Drug testing should be ordered on a regular basis.

The defendant also reports that he has benefitted from mental health counseling while incarcerated. PSR at ¶¶83-86. That should continue as he serves his sentence and while he is on supervised release.  Among other things, it should focus on anger management, domestic abuse and the PTSD that the PSR identifies. Id.

The PSR also indicates that the defendant may have some learning disabilities.  It is therefore recommended that he be assessed for those disabilities upon his release and that Probation order any required follow-up.

### F.   Reassessment of conditions at the time of release and possible referral to any gang court

Regardless of the conditions imposed at sentencing, the government urges the Court to reassess them once his release plan has been prepared by Probation as his release date approaches. It makes this recommendation because of the issues described above (that the location of the halfway house must depend on the availability and location of other programming) and because there is flux in the defendant's housing situation and in overall economic conditions.

The government also asks that the Court recommend that the defendant be considered for the Re-Start Program run by MJ Hillman and any other similar programs available at the time of his release. A reassessment of conditions at the time of release will permit the court to require participation in that program if it is deemed appropriate.  Someone in the defendant's position would seem to be an ideal candidate for such a program. The need for a curfew could also be considered at that time depending on the defendant's housing situation

### G.   Residence

A difficult issue in this case is where the defendant should live upon his release from the halfway house.  Wherever he lives, a curfew and/or other conditions should be considered to help the defendant avoid the commission of new crime that could put him in

prison for a much longer period.

                             Respectfully submitted,

                             MICHAEL K. LOUCKS
                             ACTING UNITED STATES ATTORNEY

                    By:   /s/ John A. Wortmann, Jr.
                         JOHN A. WORTMANN, JR.
                         Assistant U.S. Attorney
                         One Courthouse Way
                         Boston, MA
                         (617) 748-3207

## GOVERNMENT'S CERTIFICATE OF SERVICE

    The government hereby certifies that its Sentencing Memorandum was filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as non-registered participants.


                 /S/ John A. Wortmann, Jr.  7/1/09